[Civ. No. 31305.   Second Dist., Div. Four.   Oct. 2, 1967.]

THE SANTA FE TRAIL TRANSPORTATION COMPANY, Plaintiff and Appellant, v. DEPARTMENT OF MOTOR VEHICLES, Defendant and Respondent.

John J. Balluff and Robert B. Curtiss for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Neal J. Gobar and Mario A. Roberti, Deputy Attorneys General, for Defendant and Respondent.

JEFFERSON, J.—Petitioner, the Santa Fe Trail Transportation Company, a Kansas corporation authorized to do business in California, is a common carrier engaged in the transportation of freight by truck. Its stock is wholly owned

by the Atchison, Topeka, and Santa Fe Railway Company (hereafter "Railroad"), also a Kansas corporation. In the month of October 1964, petitioner was required to pay to the State of California certain registration fees for the use of California highways in its trucking operation. By writ of mandate, petitioner sought a refund of the fees paid, allegedly because they were not properly collectible by California. The trial court denied the petition. This is an appeal from the judgment.

The subject matter of this suit involves the proper construction to be given to an interstate compact entered into between a number of Western and Midwestern states, including California, known as the Uniform Vehicle Registration Proration and Reciprocity Agreement (hereafter, "Agreement" or "Compact"). Generally speaking, as it deals with commercial vehicles, the Compact (which went into effect in 1956) permits the operator of what it defines as a "fleet" of vehicles, to prorate registration fees in a contracting state on the basis of the miles traveled in the state as compared to the total miles traveled in the other contracting states. For the operator of vehicles engaged in interstate operations or intrastate operations incidental thereto who is not entitled to have the registration fees prorated as part of a "fleet," the agreement provides that, where the vehicles are properly registered in one contracting state (the "base state"), they are exempt from registration fees in any of the other contracting states in which they operate. The exemption from registration is referred to as "reciprocity." The Agreement spells out that, where the vehicles are entitled to be registered as part of a fleet, they are not entitled to reciprocity.[1]

These facts were submitted to the trial court pursuant to stipulation: As part of its business operations in October 1964, petitioner, using truck-tractors (motorized power units), hauled semi-trailers (shipping containers with wheels mounted only in the rear) over California streets and highways. These trailers, prior to being hauled by petitioner, were brought into the State of California by the Railroad from other states on rail flat cars, or, subsequent to such hauling, were transported out of California on flat cars to other states. This transportation method is commonly referred to as

---

[1]For a general discussion of the Agreement, see Volume 11, Vanderbilt Law Review (1958), "Licensing Interstate Vehicles: State Cooperation or Federal Intervention?" beginning at page 1007.

"piggyback operations." Most of the trailers were owned by persons other than petitioner and were leased by the owners to the Railroad. They were registered in states other than California. The truck-tractors used to haul them were owned by petitioner and all had California registrations. The tractors were specially designed and primarily used for drawing trailers in the piggyback operation.

If a California customer desired to ship freight out of the state, he would contact an agent of the Railroad who would in turn contact petitioner. The Railroad would notify the petitioner of the trailers it had available at its yards which could be used to transport the freight. The petitioner would then designate a truck-tractor to pick up one of the trailers by attaching it to the tractor. The trailer would then be hauled by the tractor over the highway to the customer's place of business where it would be loaded. It would then be pulled by the tractor to the rail terminal where it would be detached and loaded on a rail flat car of the Railroad. Special loading equipment was maintained by petitioner at each rail terminal for this purpose. When a shipment originated with a customer out-of-state, the Railroad agent would notify petitioner of the readiness of the trailer for delivery to its destination in California. Petitioner would then unload the trailer from the rail flat car, attach it to one of its tractors and deliver it to its ultimate destination in California.

The customers dealt only with the Railroad. Petitioner was paid by the Railroad for its hauling service and at a rate which depended on weight and miles traveled. Once petitioner hooked its tractor onto a trailer, it took responsibility for third-party public liability and property damage arising out of the movement of the trailer. It took responsibility for licensing and for compliance with all laws and regulations applicable to the movement of the trailer over the highways. Petitioner was responsible to the Railroad for negligently caused damage to the trailer or to its contents. The Railroad was responsible to the shipper for damage to the shipped goods. During October 1964 petitioner was required to purchase temporary trip permits, a type of temporary license fee, to move 966 piggyback-operation-trailers over highways of California. It used 38 tractors to do this job.

In holding that petitioner had no right to a refund of the fees paid, the trial court found that petitioner was engaged in operating a fleet of commercial vehicles within the

meaning of the Uniform Vehicle Registration Proration and Reciprocity Agreement; that the trailers constituted an integral part of this fleet; and that since petitioner was entitled to register the trailers as part of a prorated fleet, under the Agreement they were not exempt from registration or license fees.

Section 16 of the Agreement defines the meaning of the term fleet: "As to each contracting State, fleet shall include only those commercial vehicles which actually travel a portion of their total miles in such State. A fleet must include three (3) or more commercial vehicles, at least two (2) of which are motor vehicles."

Petitioner maintains that since none of the trailers had motors, they did not constitute a fleet as that term is defined in section 16. They were, petitioner urges, at all times under the operational control of the Railroad which leased them. Petitioner likens its part in the piggyback operation to that of a tugboat which guides an ocean liner into a harbor. In both cases, it is asserted, the tractor and the tugboat perform a service by transporting another vehicle by means best designed to get the other vehicle from one point to another, but without taking over its control or ownership.

We find no reasonable comparison between a tugboat service and petitioner's transportation operation. There is a distinct difference between one vessel assisting another which has its own motive power but lacks maneuverability, and the situation here presented. The movement of piggyback trailers over the highways to or from railroad terminals could only be accomplished through the use of tractors which hooked onto and hauled them.

The evidence presented clearly supports the conclusion that the tractors and the trailers *were utilized together* by petitioner. During October 1964, 38 tractors were used to pull 966 trailers to their respective destinations over California highways. When operated on a highway one trailer was combined with one tractor. Each tractor-trailer combination was treated by petitioner as a single integral unit. At the time a trailer was attached to a tractor, petitioner assumed responsibility for personal liability and property damage arising out of its movement. Petitioner became responsible to the Railroad for negligently caused damage to the trailer or its contents. Petitioner was also responsible for the licensing of the trailer and for compliance with all laws and regulations respecting its

movement. In short, petitioner, and not the Railroad as petitioner suggests, operated and exercised control of each tractor-trailer combination during its highway movement.

Petitioner insists that the legal ownership of the trailers must be considered. The argument is made that the trailers cannot be regarded as part of petitioner's fleet since most of the trailers were owned by companies other than petitioner and the ones actually owned by petitioner were leased to the Railroad. This position is at odds with the language of section 53 of the Agreement. Section 53 states: "If a commercial vehicle is operated by a person other than the owner as part of a fleet which is subject to the provisions of this article, then the operator of such fleet shall be deemed to be the owner of said vehicle for the purposes of this article." Petitioner draws attention to the fact section 53 is under the heading "Leased Vehicles." But the Agreement (in section 39) expressly adopts the rule of statutory construction that the substantive provisions rather than the headnotes control.

The facts demonstrate that petitioner operated the trailers on California highways; that it did so in combination with its tractors. We conclude that the trailers were operated as part of a fleet within the meaning of section 16 of the Agreement; that is to say, petitioner operated three or more vehicles, at least two of which were motor vehicles. Being part of a fleet, the trailers were not exempt from registration or licensing fees.

Having so concluded, we do not reach the question whether the trailers were shown to be properly registered in their "base state." That question becomes germane only where the vehicles are determined not to constitute a fleet.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a rehearing was denied October 30, 1967, and the following opinion was then rendered:

THE COURT.—In its petition for rehearing, petitioner urges a new theory to support the contention that its trailers were not part of a fleet. Petitioner suggests that, to be a fleet operation, both the tractors as well as the trailers must operate in some state other than California. The argument is predicated on the fact that the tractors involved were operated

solely within California, and on the interpretation petitioner gives to the wording of section 16 of the Compact.

That section reads: "As to each contracting State, fleet shall include only those commercial vehicles which actually travel a portion of their total miles in such State. A fleet must include three (3) or more commercial vehicles, at least two (2) of which are motor vehicles."

Petitioner suggests the language of section 16 that "fleet shall include only those commercial vehicles which actually travel a portion of the total miles in such state," contemplates that there be some "portion" of travel by the vehicles outside the state.

Respondent, on the other hand, maintains that this restricting of fleets to vehicles traveling a portion of their total miles in a state, was intended only to preclude a state from taxing vehicles not actually used in the state; that, as a matter of logic, tractors utilized one hundred percent in California travel "a portion"—the full portion—of their total miles in California.

We need not here choose between these respective positions. This case involves only the taxation of the trailers. Under either interpretation of the meaning of section 16, the trailers traveled "a portion" of their total miles in this state. For the reasons set out in our original opinion, since the trailers were operated in concert with the tractors, the trailers come within the definition of a fleet—which under section 16 must include three or more commercial vehicles at least two of which are motor vehicles. Whether or not the tractors, being solely operated in California, are to be registered as part of that fleet, or registered in some other manner, is not before us.

Appellant's petition for a hearing by the Supreme Court was denied December 13, 1967.